**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **ZAHRA DORRIZ,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-297 (TSC) |
| | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Zahra Dorriz brings this retaliation action against the District of

Columbia Department of Transportation pursuant to Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* and the District of Columbia Human Rights Act

("DCHRA"), D.C. CODE § 2–1401.01 *et seq.* Presently before the court is Defendant's

Motion for Summary Judgment. (ECF No. 24). For the reasons set forth below, the

court will grant the motion in part and deny the motion in part.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the record shows there is no genuine issue of

material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c);

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Waterhouse v. D.C.,* 298 F.3d 989, 991 (D.C.

Cir. 2002). "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, . . . affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials."   Fed. R. Civ. P.

56(c)(1)(A).  In determining whether a genuine issue of material fact exists, the court must view

all facts in the light most favorable to the non-moving party.  *See Adickes v. S.H. Kress & Co.,*

398 U.S. 144, 157 (1970).


## II. FIRST EEOC CHARGE: DEMOTION CLAIM

### A.  Facts

Plaintiff, who is Iranian, began her employment as an engineer with the District

of Columbia Department of Transportation ("DDOT") in October 2003 as a Project

Manager.  (*See* Pls. Ex. 25, Dorriz Dep. 35).  In that position she supervised one or two

employees.  (Dorriz Dep. 36).  At the time she was hired, her immediate supervisor was

Said Cherifi.  (Dorriz Dep. 38).  Five years later, she was promoted to Deputy Program

Manager within the Infrastructure Project Management Administration ("IMPA")

division of DDOT.  (*Id*. 41).  Her immediate supervisor in the IMPA division was Ali

Shakeri, who is also Iranian, and there was another Iranian supervisor, Adeesh Nafici,

at DDOT during this time.  (Dorriz Dep. 41; Pls. Ex. 23, Cherifi Dep. 132-33).  In her

new position, Dorriz was responsible for design and construction projects, while

supervising up to 30 employees.  (Dorriz Dep. 43-44).

Sometime later, a terminated Nigerian co-worker, Sylvester Okpala, filed a

discrimination complaint against DDOT alleging that he had been discriminated against

by Iranian supervisors, including Dorriz's supervisor, Shakeri.  *See Okpala v. D.C.*, 09-cv-1948-RLW (D.D.C.).  Okpala also alleged that Dorriz received preferential treatment from the Iranian supervisors.  (*Id.*, Compl. ¶¶ 9-10).  Around this same time, a rumor circulated that these supervisors had used their influence to get Dorriz promoted and that she was having a sexual relationship with Nafici.  (Cherifi Dep. 132-34, 136).

In the fall of 2009, Michael Jelen (who is Caucasian) conducted Dorriz's performance evaluation.  (Pls. Ex. 2, Jelen Aff. ¶ 3; Pls. Ex. 3).  He rated Dorriz's performance at four on a five-point scale, but before the evaluation was finalized he was transferred to another division at DDOT and Maduabuch Udeh, who is Nigerian, became Dorriz's supervisor.  (Jelen Aff. ¶ 3; Cherifi Dep. 42).  According to Dorriz, Udeh was friends with Okpala, the Nigerian former co-worker who filed the discrimination complaint.  (Dorriz Dep. 98-99).[1]

Around this same time, Jelen became aware that Dorriz's performance evaluation had been altered and her rating lowered.  (Jelen Aff. ¶ 4).  He responded by complaining about the matter in an email to Operations Manager Stephanie Dunbar, who is African-American.  (Jelen Aff. ¶ 5; Pls. Exs. 4-5).  After failing to receive a satisfactory response, Jelen sent a series of emails to Dunbar, some of which were copied to Udeh.  (Jelen Aff. ¶¶ 5-9; Pls. Exs. 4-5).  In

---

[1]  Plaintiff's brief states that Okapala's termination "did not sit well with Mr. Udeh."  (*See* Pls. Br. at 2; SOMF ¶ 6; Pls. Ex. 24, Udeh Dep. 62).  A review of Udeh's deposition testimony indicates that Plaintiff's counsel's description is simply misleading.  When asked if he was upset by Okpala's termination, Mr. Udeh quite plainly responded: "Just like any employee, if they lose their job, you know, I feel for them."  (Udeh Dep. 62).  This is a far cry from the picture painted by Dorriz's counsel.  The court notes that the record contains other instances where counsel for the Plaintiff characterized the evidence in a misleading manner.  Plaintiff's counsel is hereby admonished to refrain from future mischaracterizations or face sanctions.

those emails, Jelen not only complained about the altered evaluation, but also complained because he had not been consulted prior to the change, and explained his reasons for rating Dorriz as he had.  (Jelen Aff. ¶¶ 5-9; Pls. Exs. 4-5).

Dorriz also complained, first to Dunbar, who allegedly dismissed the matter and instead asked Dorriz if she knew where Nafici was now working.  (Dorriz Dep. 88-89).  When Dorriz responded that she did not know, Dunbar reportedly said "C'mon, how wouldn't you know?  You guys had [a] relationship."  (*Id.*).  Dorriz was shocked by the response.  (*Id.*).

At Dunbar's direction, Dorriz subsequently discussed her concerns about the performance evaluation with Udeh, who denied making the alterations.  (*Id.*).  Dorriz believes Udeh or Dunbar made the alterations; she claims Jelen told her he was unable to access the online performance evaluation form after he left the department and, only Udeh and Dunbar had access.  (Dorriz Dep. 88-89).  Jelen testified that he believes Dunbar made the alterations or ordered someone to make them because of what he perceived as Dunbar's discriminatory animus toward Dorriz.  (Jelen Aff. ¶ 13).[2]  Apparently, no-one at DDOT admitted to making the alterations.

Subsequently, in January 2010, Dorriz spoke with an internal EEO counselor –although the precise nature of the discussion is not entirely clear because the record contains conflicting evidence.  (*See* Pls. Ex. 7, DCHRA Determination Letter at p. 4; Pls. Br. at 5; Pls. Ex. 10 at p. 2).

---

[2]  Jelen claims to have observed Dunbar "treat Dorriz unfairly and in a discriminatory manner." (Jelen Aff. ¶ 11).  He also claims to have "personally witnessed Ms. Dunbar regularly mock Ms. Dorriz' [sic] aptitude, appearance, and dress to parties including Ms. Dorriz' [sic] superiors, peers, and direct reports in an attempt to undermine Ms. Dorriz."  (Jelen Aff. ¶ 12).  Jelen does not provide any further details about Dunbar's alleged discriminatory conduct.

In any event, on January 26, 2010, shortly after the conversation with the EEO counselor, the IMPA division was restructured and Dorriz claims she was demoted from Deputy Program Manager to Structural Engineer by her supervisor Udeh.  (*See* Pls. Ex. 8; Cherifi Dep. 59-61). Less than one month later, on February 18, Dorriz was involuntarily transferred to the role of Project Manager for the District of Columbia Street Car Project, where she had no supervisory authority.  (Dorriz Dep. 142-43).  Dorriz notes that "Project Manager" was the same title she had previously held when she began her employment with DDOT five years earlier.  Moreover, Dorriz claims the Street Car Project was underfunded and she was forced to reapply for her position periodically.  (Dorriz Dep. 84-85).

In response to these events, on February 24, 2010, Dorriz completed an EEO Intake Questionnaire in which she complained about the altered performance evaluation and her "plann[ed]" demotion.  (Pls. Ex. 9).[3]  On the form, Dorriz alleged that Dunbar, Udeh, Cherifi and others had engaged in the challenged conduct for discriminatory and retaliatory reasons.  (*Id.*).

Several months later, on April 5, 2010, Dorriz filed her first EEOC Charge of Discrimination, alleging disparate treatment and retaliation.  (Pls. Ex. 10).  In that charge, Dorriz contended that Udeh began creating a hostile environment for her because he had been friends with Okpala.  (*Id.*).  Specifically, she complained about the

---

[3] Dorriz's discussion of her "planned demotion" on the EEO questionnaire is not entirely clear, given her allegations that she had already been demoted.  At any rate, this apparent inconsistency is not material to resolution of DDOT's motion.

demotion, reassignment to temporary duty, and about Dunbar's comment regarding the alleged relationship between Dorriz and former DDOT employee Nafici. (*Id.*).

Dorriz remained on the Street Car Project for approximately one year, until February 2011, when she returned to the IPMA division. (Dorriz Dep. 85, 39). Later, during the summer of that same year, Dorriz unsuccessfully sought a promotion and ultimately filed a second EEOC Charge on March 1, 2012 over the failed promotion. (*See* Pls. Ex. 1; ECF No. 39, Notice ¶ 4).[4]

## B. Analysis

Although Plaintiff alleged in Count I of her complaint that the demotion was retaliatory, DDOT does not seek summary judgment for the demotion claim. (*See* ECF No. 7, Amend. Compl ¶ 51). Consequently, Plaintiff contends the court should deny summary judgment on this claim.[5] In its reply, DDOT argues that Plaintiff's demotion claim is not properly before this court because Plaintiff raised the claim in her first EEOC Charge, but did not raise it in the second EEOC Charge, which is the subject of this suit.

In the absence of a response by Dorriz, the court issued a Minute Order on September 16, 2015 directing Dorriz to file a Notice with the court identifying which EEOC Charge(s) formed the basis of the present lawsuit. In response, Plaintiff

---

[4] The court addresses the promotion claims more fully in Section III.

[5] In addition to the demotion claim, DDOT did not seek summary judgment on the claim surrounding the altered performance evaluation. Plaintiff did not raise the issue of the altered performance evaluation in her response to DDOT's motion.

indicated that the second charge, dated March 1, 2012, is the only charge at issue. (ECF No. 39, Notice ¶ 4).  Because the March 1, 2012 charge does not contain any allegations regarding the demotion or the allegedly altered performance evaluation, those claims are not properly before this court.  Accordingly, the court will grant summary judgment on any claims relating to those events.

## II. SECOND EEOC CHARGE: PREFORMANCE APPRAISAL, MICROMANANGING AND PROMOTION CLAIMS

### A.  The Evidence

Upon Dorriz's transfer back to the IPMA division, in February 2010, Program Manager Paul Hoffman became her immediate supervisor.[6]  (*See* Dorriz Dep. 85, 39; Pls. Ex. 21, Khalid Dep. 105).  Hoffman's supervisor was Muhammed Khalid.  (*See* Defs. Ex. 6, Khalid Dep. 102-3).

After the transfer, Dorriz applied for a promotion to the position of Program Manager.[7]  The job description specified that there were three vacancies and one of the "Conditions of Employment" was that each successful applicant "[m]ust possess and maintain current licensure as a professional engineer. . . .  Professional Engineer License required." (Pls. Ex. 1 at pp. 1, 3).

---

[6]  The parties do not identify Mr. Hoffman's race.

[7]  While the job description lists the job title as "Supervisory Civil Engineer," the parties do not dispute that Dorriz applied for the job and the position would have been a promotion.  (*See* Pls. Ex. 1).

Dorriz was ranked "highly qualified" for the position, along with eleven other candidates, including the successful candidates: Wendy Gagnier, Dawit Muluneh, and Faisal Hameed.  (Pls. Ex. 11).  Dorriz appears to believe that the deck was stacked against her from the very beginning of the interview process.  First, Dorriz claims Dunbar intentionally scheduled Dorriz's interview for days when she was not scheduled to be in the office. (Dorriz Dep. 71).  Next, Dorriz points out that two of the three interviewers, Cherifi and Dunbar, had been named in Dorriz's prior EEO complaints.  (*See* Khalid Dep. 54; Pls. Exs. 9-10).  The third person on the interview panel, Khalid, was her upper-level supervisor.  (Khalid Dep. 54, 23-24).

The panel conducted Dorriz's interview on or around August 10, 2011.  (Pls. Ex. 22, Dunbar Dep. 54).  In his affidavit, Cherifi stated he was not aware Dorriz had previously filed an EEO complaint against DDOT at the time of the interview.  (Pls. Ex. 17, Cherifi Aff. ¶ 8).  He later contradicted this statement, during his deposition, when he testified that Dunbar had mentioned Dorriz's EEO complaint to him the year before the interview.  (Cherifi Dep. 35-36, 68).  In Cherifi's view, because of Dorriz's prior EEO complaint, Dunbar's presence on the panel constituted a conflict of interest. (Cherifi Dep. 68).  Indeed, according to Cherifi, Dunbar apparently recognized this conflict and explained prior to the interview that she intended to recuse herself from "being part of the scoring."  (Cherifi Dep. 68).

With respect to the potential conflict of interest posed by her service on the interview panel, Dunbar testified that she "had no reason not to sit on the panel." (Dunbar Dep. 80).  When asked, hypothetically, whether she would select persons to

serve on an interview panel that had been the subject of allegations by one of the

applicants, she responded:

    A. Probably not.

    Q. And why not?

    A. Well, it depends on - - I don't' know.  I don't know.  I don't know.

    Q. Do you believe that it was a conflict of interest for you to sit on Ms. Dorriz's interview panel?

    A. Knowing what I know now, yes.  But then, no.

(Dunbar Dep. 80).

When asked whether she had been aware of Dorriz's EEO complaint at the time

of the interview, Dunbar's testimony is troubling when considered along with other

evidence in the record.  Initially, Dunbar appeared to indicate that she was indeed aware

of the discrimination charge at the time of the interview.  In an affidavit dated June 21,

2010, that specifically discussed Dorriz's discrimination allegations, Dunbar stated that

"I did not make the statement that she alleged in her Charge of Discrimination."

(Dunbar Aff. ¶ 5).  Dorriz points out that this statement indicates Dunbar was aware of

the EEO complaints at the time of the interview because the 2010 affidavit was

prepared <u>prior</u> to the 2011 interview.  In contrast, during her deposition—taken after

this lawsuit was filed –Dunbar testified it "is possible. . . .  I could have been" aware of

Dorriz's charge at the time of the interview.  (Dunbar Dep. 79).  When questioned about

the apparent conflict between the deposition and the affidavit, Dunbar indicated she had

not drafted the affidavit and, therefore, she did not understand the statement in the

affidavit regarding the discrimination charge.  (Dunbar Dep. 72-79).  Yet, Dunbar admits she read and signed the affidavit under oath.  (*Id*.).

According to Dorriz, not only was Dunbar's presence on the panel problematic, but Cherifi's presence was as well.  Cherifi, however, testified that he did not believe his presence on the interview panel constituted a conflict because he claimed that, at the time of the interview, he was not aware he had been named in Dorriz's prior discrimination complaints.  (Cherifi Dep. 98).  He claims that if he had known Dorriz had named him in a prior complaint, he would have recused himself.  (*Id.*).

While there is no indication that Khalid was named in the EEO complaints Dorriz made prior to the interview, there appears to be conflicting evidence about whether he was aware of the complaints at the time of the interview.  In his affidavit, Khalid explicitly stated he was not aware of Dorriz's EEO complaint against DDOT at the time of the interview.  (Khalid Aff. ¶ 8).  Yet, in his deposition, he subsequently appears to admit he was aware of at least one prior EEO complaint Dorriz had made.  (Khalid Dep. 24-28). [8]

Dorriz claims that, during her interview, the panel asked her what she considered irrelevant questions, such as "you look like you are nervous and tired."  (Dorriz Dep. 137, 69).  She also alleges that Khalid repeatedly cut her off when she attempted to answer questions.  (Dorriz Dep. 69).

---

[8] Despite testimony to the contrary, even in its reply brief DDOT continues to assert that there is no evidence Khalid or Cherifi knew about Dorriz's EEO complaints at the time of the interview.  (Amended Reply Br. at 10).

Notwithstanding Dunbar's alleged statement that she would not be "part of the scoring," she did have some involvement.  Each panelist had a form that listed interview questions and provided space to write notes after each question.  Dunbar admits that on Cherifi's form for Dorriz, Dunbar wrote in the numerical scores for each question in the left margin and she wrote the total score in the upper right hand corner.  (Dunbar Dep. 58-59).  Dunbar's same notations appear on Khalid's form.  (*See* Pls. Exs. 12-13; *see* Defs. Ex. 6, Khalid Dep. 107-09).  Moreover, Khalid testified that the "right way to do it" would have been for him to write the numbers himself, but the numbers on his score sheet were "very closely related" to the numbers he would have given had he done the scoring himself.  (Khalid Dep. 113).

Dunbar's involvement in the scoring did not stop there.  Although she testified that she played no role in determining who was selected, the record also contains an interview form for Dorriz that lists Dunbar's name as the interviewer.  (Pls. Ex. 14; Dunbar Dep. 40, 54).  On that form, Dunbar wrote notes after each question and, like the forms completed by the other panelists, Dunbar's form contains scores listed in the left column for each question and a total score listed in the upper right hand corner.  (*See* Pls. Ex. 14).  Dorriz points out that the scores of the three interviewers were the same or within one point of each other: Cherifi rated Dorriz 54 and both Khalid and Dunbar rated Dorriz 53.  (*See* Pls. Exs. 12-14).  Dunbar, however, denies modifying the actual scores provided by the other interviewers.  (Dunbar Dep. 62).

Dorriz alleges that in addition to not selecting her for the Program Manager position, DDOT officials also retaliated against her by micromanaging her work.

Specifically, she alleges that she supervised few if any employees, she was not invited to meetings, and her involvement in projects was minimized.  (Dorriz Dep. 142-45). Dorriz also claims that Hoffman, her immediate supervisor, told her that Khalid had ordered Hoffman to lower Dorriz's performance evaluation because she was suing DDOT.  (Dorriz Dep. 147).

## B.  Analysis

To establish a prima facie case for retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a),[9] a plaintiff must present evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took a "materially adverse" employment action against her; and (3) the adverse action was causally related to the exercise of her rights.[10]  *Porter v. Shah*, 606 F.3d 809, 817-18 (D.C. Cir. 2010); *Holcomb v. Powell*, 433 F.3d 889, 901-2 (D.C. Cir. 2006) (citations omitted).

---

[9]  "The legal standard for discrimination under the DCHRA is substantively the same as under Title VII." *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 73, 84 (D.D.C. 2002) (alterations omitted) (citing *Knight v. Georgetown Univ.,* 725 A.2d 472, 478 n. 5 (D.C. 1999)); *Daka v. Breiner,* 711 A.2d 86, 92 (D.C. 1998).

[10]  DDOT contends that Dorriz cannot meet the causation requirement with respect to her promotion claim because she has no circumstantial evidence linking her protected activity with the alleged retaliatory conduct, other than the fact that her non-selection occurred sometime after her protected activity.  Noting that sixteen months passed between Dorriz's April 2010 EEO charge and her August 2011 interview, DDOT argues that she fails to establish temporal proximity and, therefore, fails to establish causation.

DDOT's temporal proximity argument is unpersuasive because Dorriz alleges ongoing retaliation in the form of demotions and reduced work responsibility that allegedly started well before she filed the April 2010 charge and continued through the time she filed the present lawsuit.  (*See* Amend. Compl. ¶ 44; Dorriz Dep. 142-43).

DDOT raises three arguments in support of its motion for summary judgment on the claims associated with Dorriz's second EEOC Charge, in which she alleged that DDOT retaliated against her when it failed to select her for the promotion and when it micromanaged her work.  First, DDOT argues that Dorriz has not established a prima facie case for discrimination because the alleged retaliatory conduct did not deter her from engaging in protected activity.  Second, the agency contends that Dorriz has no evidence to support her allegations that Khalid, who was not her direct supervisor, was behind the alleged micromanaging and lowered performance appraisal.  DDOT argues that even if she did have such evidence, the challenged conduct did not constitute "materially" adverse employment actions.  Finally, DDOT asserts that Dorriz cannot overcome the agency's legitimate non-discriminatory reasons for failing to select her for the Program Manager position.

1. <u>Adverse Employment Action Arguments</u>

DDOT first argues that Dorriz has not presented evidence that she suffered any adverse action as a result of the alleged retaliation:

> A plaintiff must demonstrate that the alleged adverse employment action "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citations omitted).  Here, because Plaintiff twice testified that she would not have been dissuaded by any of the conduct she alleges, (Dorriz Tr. 132:10-16; 139:3 – 140:3; SOF ¶ 2), she cannot demonstrate that she suffered any adverse retaliatory action.

(Defs. Br. at p. 5).  DDOT's argument is disingenuous.

In *Burlington North & Sante Fe Railway Company v. White*, 548 U.S. 53, 57 (2006), the case upon which DDOT relies, the Supreme Court was faced with the question of "how harmful . . . adverse actions" must be in order to fall within the scope of Title VII's anti-retaliation provision.  Faced with a split among the Circuits, the Supreme Court held that Title VII's anti-retaliation provision "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." *Id.* at 57, 59-60.  In other words, a plaintiff bringing a Title VII retaliation claim "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citations and internal quotations omitted) (emphasis added). In adopting this approach, the Court noted that "[t]he antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms.  It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id.* at 68 (citations and internal quotations omitted) (emphasis added).

Thus, the *Burlington North* standard simply looks at whether a reasonable person under the circumstances would likely have been deterred from engaging in protected activity, not whether that person was actually deterred from doing so.  Accordingly, it is nonsensical to argue, as DDOT essentially does, that an employee who is deterred from engaging in protected activity has a remedy, but an undeterred employee like Dorriz is left in the lurch.  DDOT, apparently realizing its argument was illogical, refrained from championing this argument in its reply brief.

Page **14** of **23**

(*See* ECF No. 38, Amended Reply Br. at 7-8). [11]   Instead, the agency changed course and argued that any lowered performance evaluation or micromanaging in this case did not constitute "material" adverse employment actions.  With respect to the lowered performance evaluation, DDOT points out that in the District of Columbia Circuit, a lowered performance evaluation is "materially adverse" if it negatively impacts the plaintiff's "position, grade level, salary or promotion opportunities."  (Defs. Amended Reply at 12).  Indeed, post-*Burlington* cases in this Circuit have repeatedly rejected retaliation claims centered around performance evaluations that were not attached to some type of "objectively tangible harm."  *See, e.g., Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (plaintiff radio announcer failed to produce evidence of "objectively tangible harm" where employer reduced her on-air time from 17 minutes to 13 minutes); *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. 2009) (finding that an evaluation which was lowered from "outstanding" to "excellent" was not materially adverse because plaintiff's "bare, conclusory allegation that she was denied promotional and bonus opportunities . . . d[id] not discharge her burden to show the evaluations were 'attached to financial harms.'") (citations omitted); *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("Baloch did not produce evidence showing that the 2003 negative performance evaluation could affect his position, grade level, salary, or promotion opportunities") (citations omitted).

---

[11]   DDOT also appears to have abandoned its argument that Dorriz has not produced evidence of retaliation by Khalid.  In its opening brief, DDOT argued that it was undisputed that Khalid was not Dorriz's first-line supervisor and, therefore, he could not have micromanaged her.  (Defs. Br. at pp. 7-8).  Similarly, the agency argued that Khalid never evaluated Dorriz because his role was to review Hoffman's evaluation.  (*Id.*).  The agency did not address this argument again in its reply brief – and rightly so.  There was nothing about being Dorriz's upper-level manager that would have precluded Khalid from participating in or influencing the conduct about which she complains.  (*See* Defs. Ex. 6, Khalid Dep. 103-5).

Here, Dorriz does not allege that she suffered tangible harm as a consequence of the performance evaluation allegedly lowered by Hoffman at Khalid's direction. Indeed, she failed to make any substantive arguments on this issue. This case is, therefore, unlike *Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010), where the plaintiff's supervisor placed a written interim evaluation of unacceptable performance in plaintiff's personnel file, in violation of company policy, and thereby subjected plaintiff to removal, reduction in grade, withholding of pay increases and reassignment. Accordingly, on the present record, the court finds that Dorriz's lowered performance evaluation under Hoffman and Khalid did not constitute a "materially adverse" employment action. Thus, she has not made out a prima facie for discrimination on this claim.

Despite the court's finding, at this juncture DDOT is not entitled to summary judgment on this issue because the agency did not raise this argument in its primary brief and, generally, courts decline to consider arguments raised for the first time in a reply brief. *See Am. Wildlands v. Kempthorne,* 530 F.3d 991, 1001 (D.C. Cir. 2008) ("We need not consider this argument because plaintiffs . . . raised it for the first time in their reply [brief].") (citations omitted). Applying this rule is particularly appropriate here because DDOT made the issue of whether Dorriz satisfied the "adverse employment" action requirement an essential part of its opening brief. Thus, the court will hold in abeyance its ruling on this issue and allow Dorriz an opportunity to respond.

DDOT argues that, as with the lowered performance evaluation issue, any micromanaging by Dorriz's supervisors was not actionable. According to DDOT, Dorriz's allegations are vague and constitute unsubstantiated opinion evidence. DDOT also argues that

Dorriz's complaints are simply the result of hurt feelings and workplace frustrations that do not constitute "materially" adverse employment actions.  (Defs. Amended. Reply at 14-15).

DDOT's argument is without merit because Dorriz's testimony is not vague and she does far more than complain about mere workplace frustrations.  Dorriz specifically testified that, upon her return to the IPMA division, she supervised at most one or two employees.  (Dorriz Dep. 143-44).  Moreover, such supervision merely involved approving the employees' timesheets, rather than giving them work assignments.  (Dorriz Dep. 143-44).  Dorriz also claims she was pushed aside and relived of all of decision-making involvement, and was not invited to participate in "important" meetings, such as those involving the selection process for consultants. (Dorriz Dep. 144-45).  She alleges that because of these actions, not only has she been "prevent[ed] from . . . advancing in [her] career," but she has also been pushed "back maybe 20 years."  (Dorriz Dep. 145).  She attributes this retaliatory conduct to "DDOT management," including "Khalid and [Hoffman] the chief engineer."  (Dorriz Dep. 144-45).  Dorriz's testimony regarding the actions of her managers and the loss of her supervisory duties is sufficient  to meet the "materiality" standard.  As the D.C. Circuit has recognized, "reassignment with significantly different responsibilities . . . generally indicates an adverse action."  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citation omitted); *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013).  Likewise, exclusion from important meetings can constitute a materially adverse employment action.  *See Allen v. Napolitano*, 774 F. Supp. 2d 186, 199-200 (D.D.C. 2011).

In sum, DDOT's argument that there is no genuine issue of material fact with regard to whether Dorriz suffered an adverse employment action is unavailing, with the exception of the argument that the lowered performance evaluation was not sufficiently material to be actionable.

The court will reserve its ruling on that issue alone in order to allow Plaintiff to file a sur-reply brief.  Defendant's motion will be denied on Dorriz's micromanaging claim.

2.  Promotion Claim

DDOT argues that it is entitled to summary judgment on Dorriz's promotion claim because she cannot overcome the agency's proffered reasons for her non-selection.  DDOT offers Cherifi's affidavit, in which he stated that Dorriz did not have the skills or experience to excel in the position, and that her responses to interview questions merited low scores.  (Cherifi Aff. ¶¶ 5-6).  Cherifi also stated that DDOT determined the successful candidates were "more" qualified.  (Cherifi Aff. ¶ 6).  Similarly, Khalid stated in his affidavit that Dorriz performed poorly during the interview and DDOT determined the successful candidates were "more" qualified. (Khalid Aff. ¶¶ 5-7).

> In a Title VII action, once an employer asserts a legitimate, nondiscriminatory reason for an adverse employment action, the district court must conduct one central inquiry in considering an employer's motion for summary judgment or judgment as a matter of law: whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was [mere pretext for unlawful discrimination].

*Adeyemi v. D.C.*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (citation omitted); *see Primas v. D.C.*, 719 F.3d 693, 697 (D.C. Cir. 2013).  Sufficient evidence of unlawful discrimination can include "evidence the plaintiff presents to attack the employer's proffered explanation for its actions," including "changes and inconsistencies in the stated reasons for the adverse action [or] the

employer's failure to follow established procedures or criteria." *Evans v. Sebelius*, 716 F.3d 617,

620 (D.C. Cir. 2013) (citations and internal quotations omitted).

Here, as described above, Dorriz has adduced ample evidence that DDOT failed

to follow "established criteria," as well as evidence regarding "changes and

inconsistences" in DDOT's reasons for her non-selection. *See Sebelius*, 716 F.3d at 620.

Most significantly, despite the statements in Cherifi and Khalid's affidavits, Dorriz has

produced evidence that Hameed, the selected candidate, was not the "most" qualified.

Even though the job description specified that successful applicants "[m]ust possess and

maintain current licensure as a professional engineer. . . . Professional Engineer

License required," DDOT does not dispute that Hameed had no such license and only

eight years of professional experience.  (*See* Dorriz Dep. 72-73, 174; Khalid Dep. 157;

Pls. Ex. 1 at pp. 2-3).  In contrast, Dorriz testified that she does have a professional

engineering license and has thirty-two years of experience.  (Dorriz Dep. 72-73).

Perhaps realizing the problem this evidence presents, DDOT has now taken a

different approach.  Specifically, in its brief, DDOT now defends its hiring decision by

asserting that the three selectees were "uniquely" qualified for the position.  (Defs. Br.

at p. 7).  During his deposition, Khalid attempted to explain DDOT's deviation from the

job description requirements.  When asked what made Hameed "stand out as an

applicant," Khalid testified that:

> One of those three positions was really a person who would be the
> DDOT's NEPA, National Environmental Protection [sic] Act expert,
> which is a critical position, as is [sic] required by legislation that
> every state DDOT has a person who would clear the NEPA
> documentations for the city or the state.

Page **19** of **23**

> That is a - - that is a core function that has to be done.   And Dr. Faisal Hameed has - - is an industry expert in that act, and he has actually developed manuals and standards for the District of Columbia or the DDOT.  And he is a national expert.  He not only does it for us, but he also presents his expertise in this area.
>
> So as I mentioned, one of those positions required - - it was for that office, it would be the coordinator for the environment documentations, and he stood out from all of our applicants in that area.  He would just – just – he was just absolutely the right fit for that position.
>
> And that position was not a hardcore engineering, it was more of an environmental reviews and coordination.  Of course there's some engineering element is [sic] there, but that position does not require actually review and approve designs.   So therefore, he just was – was the best candidate for that particular position.

(Khalid Dep. 160 – 61).

Khalid's testimony is undermined by the testimony of his fellow panelist, Cherifi.  Despite Khalid's testimony that the position did not really require an engineering license, Cherifi testified that he did not know if the successful applicants for the position had professional engineering licenses, but he would not have recommended hiring an applicant for the position who did not have such a license "[b]ecause it's mandatory."  (Cherifi Dep. 108) (emphasis added).

In light of this evidence –from DDOT's own witnesses and documents – a reasonable jury could find that the agency's decision to ignore the engineering license requirement was a pretext for retaliation against Dorriz, especially where, as here, the employer instead claims after the fact to have relied on specialized skills that were not even mentioned in the job description.  *See Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104, 1109 (8th Cir. 1994) (reasonable minds could find evidence of pretext where company claimed that the younger employee, who

essentially replaced plaintiff, was more valuable to the company because his computer skills were "critical," but plaintiff demonstrated, *inter alia*, that the need for computer skills was not mentioned in the new job description and the personnel director had never been informed of this need).

Not only has Dorriz produced evidence that DDOT changed its justification for the hiring decision and that the agency failed to follow its published hiring criteria, she also points to a substantial amount of additional circumstantial evidence that DDOT's reasons for her non-selection may have been pretextual.  Specifically, Dorriz points to: (1) conflicting evidence about the extent to which the panelists knew of Dorriz's prior EEO complaints at the time of her interview; (2) the apparent conflict of interest created by Dunbar's presence on the panel, given the allegations Dorriz had made against her in the prior EEO complaints; (3) Dunbar's involvement in the scoring of Dorriz, despite testimony that Dunbar had pledged to refrain from becoming involved; and (4) the similarities in the panelists' scores for Dorriz.  Viewing this record in its entirety, a reasonable fact-finder could infer something "fishy" about the selection process for the Program Manager position Dorriz unsuccessfully sought.  *See Salazar v. Washington Metro. Transit Auth.*, 401 F.3d 504, 509 (D.C. Cir. 2005) ("jury could infer something 'fishy'" from selection process where, *inter alia*, there were questions about the composition of the interview panel and the weight attributed to scoring the applicants).

### III. DCHRA CLAIMS

Finally, DDOT argues that Dorriz's DCHRA claims are not properly before this court because she elected an administrative remedy before the District of Columbia

Office of Human Rights (DCOHR).  "[T]o preserve the right to bring the same action in court, withdrawal of an administrative complaint must occur prior to the DCOHR's disposition." *Adams v. D.C.*, 793 F. Supp. 2d 392, 397 (D.D.C. 2011) (alterations omitted and internal quotations omitted) (*citing Anderson v. U.S. Safe Deposit Co.*, 552 A.2d 859, 860 (D.C. 1989). In other words, Dorriz cannot bring her DCHRA claims in this court unless "she withdr[e]w her administrative complaint prior to receiving a notice of a probable cause determination." *Adams*, 793 F. Supp. 2d at 397.

Consistent with this argument, in its statement of undisputed facts, DDOT alleged that the DCOHR issued a "no probable cause" determination on Dorriz's administrative complaint before she brought this suit.  (Defs. SOF ¶ 7).  Plaintiff failed to respond to DDOT's factual assertion in her response, nor did she address DDOT's argument.  Therefore, the court will treat the matter as conceded and grant summary judgment on the DCHRA claims asserted in Count II of the Amended Complaint.  *See* LCvR 7(b); *McGinnis v. D.C.*, 65 F. Supp. 3d 203, 224 (D.D.C. 2014); *Lewis v. United States*, Civ. A. No. 90-0991, 1990 WL 179930, at * 2 (D.D.C. Oct. 29, 1990).

## IV. CONCLUSION

For the reasons set forth above, the court will grant DDOT's motion for summary judgment with respect to the claims raised in Dorriz's first EEOC Charge.  The court will hold in abeyance a ruling on Dorriz's retaliation claim over the performance evaluation lowered by Hoffman at the direction of Khalid.  The court will grant summary

judgment on Count II of the complaint which asserts retaliation claims under the DCHRA.


Date:  September 30, 2015


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge